-2068-MBB
-2069-MBB
-2070-MBB
-2071-MBB
-2072-MBB

## AFFIDAVIT OF STEPHEN P. DOWD

I, Stephen P. Dowd, being duly sworn, state under oath as follows:

### INTRODUCTION

1.      I have been employed as a Postal Inspector by the United States Postal Inspection

Service ("USPIS") for the past 20 years.  I have been assigned to, and have specialized in, drug

investigations for the past 14 years.  During this time, I have participated in numerous

investigations involving the transportation of controlled substances or proceeds/payments

through the United States Postal Service ("USPS"), and I have intercepted in excess of 700

Express Mail and/or Priority Mail packages that contained controlled substances or the proceeds

from the sales of controlled substances.  I have received training by the Drug Enforcement

Administration in the investigation of controlled substances.  I have received training by the

USPIS in the investigation of controlled substances and proceeds/payments for controlled

substances being transported through the United States mails.

2.      As a Postal Inspector, I am authorized to investigate violations of the law of the

United States, including violations of the federal drug laws in Title 21 of the United States Code.

I am a "federal law enforcement officer" within the meaning of Rule 41(a)(2)(C) of the Federal

Rules of Criminal Procedure – that is, a government agent engaged in enforcing the criminal

laws. During my time as a Postal Inspector, I have participated in hundreds of investigations

involving all facets of the illegal drug industry, including trafficking, money seizures, and

property seizures.  I have participated in investigations in both overt and undercover capacities.  I

personally have participated in all aspects of drug trafficking investigations, including

conducting surveillance, using confidential informants, acting in an undercover capacity,

executing search warrants, and conducting Court-authorized interceptions of wire and electronic

communications.  I have interviewed and debriefed numerous cooperating witnesses and

defendants concerning all aspects of drug trafficking organizations, and am familiar with the

methods, practices, and techniques used by drug traffickers to obtain, store, transport and

distribute controlled substances, as well as the manner in which they conceal and launder drug

proceeds.  I have served as the affiant in numerous federal search warrants and GPS warrants.

3.      I am familiar with the manner in which illegal drug traffickers use vehicles,

common carriers, mail and private delivery services, and a variety of other means to transport

and distribute controlled substances and the proceeds from drug trafficking.  From my training

and experience, I am aware that drug traffickers often transport drugs and drug proceeds in motor

vehicles, and that drug traffickers often use motor vehicles to meet with other coconspirators,

including their sources of supply and/or their drug customers.  Drug traffickers also use motor

vehicles to travel to banks and other financial institutions to deposit drug proceeds and/or

transfer funds to purchase drugs.  Experienced drug traffickers will often engage in counter-

surveillance maneuvers while driving a vehicle in an attempt both to determine whether they are

being followed by law enforcement and to disrupt any surveillance activities being conducted by

law enforcement.  I am also aware, from my training and experience, that drug traffickers often

install and use electronically operated hidden compartments in motor vehicles to transport large

quantities of drugs and drug proceeds.

## PURPOSE OF THIS AFFIDAVIT

4.      I am submitting this affidavit in support of applications for five (5) search

warrants for the following locations:

    (a)    185 Metropolitan Avenue, Apartment 3, Roslindale, Massachusetts, which, as will be discussed, is where Pablo SANTIAGO-CRUZ resides (hereinafter "the SANTIAGO-CRUZ Residence").  A complete description of the SANTIAGO-CRUZ Residence as well as a photograph is set forth in Attachment A-1, which is attached hereto and incorporated herein.

    (b)    47 Winthrop Street, Apartment 5, Framingham, Massachusetts, which, as will be discussed, is where Carlos REYES resides (hereinafter "the REYES Residence").  A complete description of the REYES Residence as well as a photograph is set forth in Attachment A-2, which is attached hereto and incorporated herein.

    (c)    404 Technology Center Drive, #3112, Stoughton, Massachusetts, which, as will be discussed, is where Angel MORALES resides (hereinafter "the MORALES Residence").  A complete description of the MORALES Residence as well as a photograph is set forth in Attachment A-3, which is attached hereto and incorporated herein.

    (d)    41B Mathewson Drive, Weymouth, Massachusetts, which, as will be discussed, is the address for a business called "Angel's Auto Detailing and Handwash," which is operated by Angel MORALES.  A complete description of this location as well as a photograph is set forth in Attachment A-4, which is attached hereto and incorporated herein.

    (e)    A brown two-car detached garage located across the street from 188 South Central Avenue, Quincy, Massachusetts, which, as will be discussed below, is being used by Pablo SANTIAGO-CRUZ.  A complete description of this location as well as a photograph is set forth in Attachment A-5, which is attached hereto and incorporated herein. Hereinafter, this location will be referred to as "the Brown Garage."

In this Affidavit, I will refer to the locations described in Attachments A-1, A-2, A-3, A-4, and A-5 collectively as "the Target Locations."

    5.    I am also submitting this affidavit in support of an application for a search warrant authorizing the search of the following USPS parcel:

    (a)    One USPS Priority Mail parcel bearing tracking number 9505512157316200008141 (hereafter "the SUBJECT PARCEL").  The SUBJECT PARCEL is a brown USPS Priority Mail box measuring

approximately 20 inches long, 14 inches wide, and 10 inches thick and
weighing approximately ten pounds fourteen ounces.  The SUBJECT
PARCEL is addressed to "Rafael Perez, P.O. Box 2425, Bayamon, Puerto
Rico 00960-2425" and bears a return address of "Jorge Montalvo, 192
School Street, Quincy, MA 02169."  A full description of the package to
be searched is set forth in Attachment A-6, which is attached hereto and
incorporated herein by reference.

6.     I am seeking these search warrants in furtherance of an ongoing criminal

investigation into the activities of several individuals, both known and unknown, including Pablo

SANTIAGO-CRUZ ("SANTIAGO-CRUZ"), Carlos REYES ("REYES"), Angel MORALES

("MORALES"), Roberto FONSECA-RIVERA ("FONSECA-RIVERA"), and Jorge

MONTALVO ("MONTALVO") for violations of federal criminal laws, including, but not

limited to, the distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); use of

a communications facility in the commission of controlled substances trafficking offenses, in

violation of 21 U.S.C. § 843(b); conspiracy to commit drug trafficking offenses, in violation of

21 U.S.C. § 846; and money laundering offenses, in violation of 18 U.S.C. §§ 1956, 1957

(collectively, "the Target Offenses").

7.     SANTIAGO-CRUZ and REYES have previously been convicted of federal drug

trafficking offenses.  SANTIAGO-CRUZ, who was born in Puerto Rico, was arrested in 2007

after taking possession of a FedEx parcel containing a quantity of cocaine that had been shipped

from Puerto Rico.  SANTIAGO-CRUZ pled guilty to attempted possession of 500 grams or

more of cocaine in the Eastern District of Pennsylvania and was sentenced to 70 months in

prison followed by four years of supervised release.  Upon release from prison, SANTIAGO-

CRUZ was supervised in the District of Massachusetts, where he violated his release conditions

on multiple occasions.  SANTIAGO-CRUZ is no longer on federal supervision.

4

8.      REYES, who was born in Massachusetts, was sentenced to 188 months in federal prison in 2002 after having been convicted of charges relating to the distribution of cocaine. REYES is currently on federal supervised release in the District of Massachusetts.  SANTIAGO-CRUZ and REYES were both incarcerated at the Federal Correctional Institution in Ray Brook, New York from January 2008 through September 2009.

9.      I have personally participated in the investigation discussed in this affidavit since February 2016, and I am familiar with the facts discussed below.  My personal involvement has included, among other things, conducting surveillance, identifying suspicious USPS parcels mailed from Puerto Rico to Massachusetts, identifying suspicious USPS parcels mailed from Massachusetts back to Puerto Rico, and reviewing various business and motor vehicles records. I am also familiar with the facts and circumstances of this investigation from oral and written reports by agents of Homeland Security Investigations (HSI) and members of the Massachusetts State Police ("MSP"), who have assisted in this investigation.

10.      Because this affidavit is being submitted for the limited purpose of securing search warrants, I have not included each and every fact known to me and other law enforcement officers involved in this investigation.  Rather, I have included only those facts that I believe are necessary to establish probable cause for the issuance of the requested search warrants.  Facts not set forth herein are not being relied upon in reaching my conclusion that there is probable cause to support the issuance of the requested warrants.  Nor do I request that this Court rely on any facts not set forth herein in reviewing this application.

## GENERAL BACKGROUND CONCERNING THE SHIPMENT OF DRUGS AND DRUG PROCEEDS THROUGH THE UNITED STATES MAILS

11.     Experience and drug trafficking intelligence information gathered by the USPIS have demonstrated that USPS Priority Mail Express and Priority Mail are frequently used by drug traffickers for shipping drugs and drug proceeds.  Use of Priority Mail Express and Priority Mail are favored because of the speed, reliability, free telephone and Internet package tracking service, as well as the perceived minimal chance of detection.  Priority Mail Express was originally intended for urgent, business-to-business, correspondence.  However, based on USPIS intelligence and my personal experience with numerous prior packages that were found to contain contraband, these types of packages containing contraband are usually sent from one individual to another individual.

12.     In an effort to combat the flow of controlled substances through the United States mails, interdiction programs have been established in cities throughout the United States by the USPIS.  These cities have been identified as known sources of controlled substances.  The USPIS conducted an analysis of prior packages which were found to contain drugs and drug proceeds.  This analysis of prior packages that were found to contain drugs or drug proceeds indicated that these packages were usually sent from an individual to an individual.  In the cases when the Priority Mail Express packages containing drugs or drug proceeds displayed a business or company name, it was usually established that this was a fictitious business or company, or, in certain cases, a legitimate company whose name was being used without the knowledge or authorization of that business.  Additionally, this analysis established a series of package characteristics which, when a package is found with a combination of the characteristics

6

described below, have shown high probability that the package will contain a controlled substance or the proceeds of controlled substance sales. These characteristics include the following: (1) the package was mailed from, or addressed to, a narcotic source city; (2) the package has a fictitious return/sender address or name; (3) the package has address information which is handwritten; (4) the handwritten mailing label on the package does not contain a business account number, thereby indicating that the sender paid cash; (5) the package was addressed from an individual to an individual; and (6) the package was heavily taped.

13.     Based on my training and experience and USPIS intelligence, the characteristics in paragraphs 11 and 12 are indicative of packages sent either by Priority Mail Express or Priority Mail that have been found to contain illegal controlled substances and drug proceeds.

## INVESTIGATION BACKGROUND AND OVERVIEW

14.     My investigation has developed evidence providing me with probable cause to believe that SANTIAGO-CRUZ, REYES, MORALES, FONSECA-RIVERA and MONTALVO are receiving suspicious parcels containing controlled substances that are being shipped from Puerto Rico via the USPS. I know based on my training and experience that Puerto Rico is a source area for controlled substances – more specifically, for cocaine. I have also identified a number of suspicious parcels mailed by SANTIAGO-CRUZ from Massachusetts to Puerto Rico, two of which I have opened pursuant to federal "sneak and peek" search warrants and determined that they contained U.S. currency. I believe that these packages being sent by SANTIAGO-CRUZ represent either drug proceeds and/or payments of an additional supply of controlled substances.

15.     In furtherance of the investigation, I have sought and obtained federal tracking

warrants on various motor vehicles used by SANTIAGO-CRUZ, MORALES, and FONSECA-

RIVERA.  For example, on June 6, 2016, pursuant to a federal tracking warrant issued in 16-MJ-

7174-JCB, agents installed a GPS tracking device on a white 2016 Toyota Tacoma pickup truck,

bearing VIN 3TMDZ5BN6GM008401 and Massachusetts Registration 6DP274, which

SANTIAGO-CRUZ began leasing on May 20, 2016 (hereinafter "the SANTIAGO-CRUZ

Toyota Tacoma").  Prior to leasing the SANTIAGO-CRUZ Toyota Tacoma, SANTIAGO-CRUZ

owned and operated a 2006 BMW 325Xi bearing Massachusetts registration 916SRI ("the

SANTIAGO-CRUZ BMW").  On May 8, 2016, agents installed a GPS tracking device on the

SANTIAGO-CRUZ BMW pursuant to a federal tracking warrant (16-MJ-7122-JCB).  This

device was removed on May 22, 2016, after SANTIAGO-CRUZ relinquished ownership of the

SANTIAGO-CRUZ BMW.  As will be discussed, agents have observed SANTIAGO-CRUZ

operating the SANTIAGO-CRUZ Toyota Tacoma (and before that, the SANTIAGO-CRUZ

BMW) in furtherance of suspected drug trafficking activities.

16.     On June 7, 2016,  pursuant to a federal tracking warrant issued in 16-MJ-7178-

JCB, law enforcement officers installed a GPS tracking device on a black 2015 Ford F-350

pickup truck, bearing VIN 1FT8W3BT6FEC85678 and Massachusetts Registration 2PL646,

which is registered to Angel MORALES, 404 Technology Center Drive, #3112, Stoughton,

Massachusetts 02072 (hereinafter "the MORALES Ford F-350").  On June 10, 2016,  pursuant to

a federal tracking warrant issued in 16-MJ-7179-JCB, law enforcement officers installed a GPS

tracking device on a gray 2011 Jeep Wrangler, bearing VIN 1J4BA5H14BL631488 and

Massachusetts registration 537SJ1, which is registered to Karen BUENO, 404 Technology

8

Center Drive, #3112, Stoughton, Massachusetts 02072 (hereinafter "the gray 2011 Jeep

Wrangler"). As will be discussed below, surveillance officers have observed Angel MORALES

("MORALES") and Roberto FONSECA-RIVERA ("FONSECA-RIVERA") using the

MORALES Ford F-350 and the gray 2011 Jeep Wrangler in furtherance of suspected drug-

trafficking activities.

17.    During the investigation, surveillance agents have observed SANTIAGO-CRUZ

use the SANTIAGO-CRUZ Toyota Tacoma to meet with individuals who received the

suspicious parcels from Puerto Rico and/or take possession of some of the parcels or what

appeared to be some of the contents of those parcels. Similarly, MORALES and FONSECA-

RIVERA have been observed using the MORALES Ford F-350 and the gray 2011 Jeep

Wrangler to retrieve suspicious parcels from Puerto Rico and to meet with other individuals who

received the parcels and/or take possession of what appears to be some of the contents of those

parcels.

### The Relationship of Various Locations, including the Target Locations, with SANTIAGO-CRUZ, MONTALVO, REYES, MORALES, and/or FONSECA-RIVERA

18.    185 Metropolitan Avenue, Apartment 3, Roslindale, Massachusetts ("the

SANTIAGO-CRUZ Residence"): I believe that SANTIAGO-CRUZ resides at this location and

that he has lived here since early May 2016. Prior to living here, SANTIAGO-CRUZ lived at

192 School Street, Quincy, Massachusetts ("192 School Street").[1] On May 5, 2016, surveillance

officers observed SANTIAGO-CRUZ carrying clothes and what looked like a laundry basket

---

[1] According to the landlord at 192 School Street, MONTALVO also lived at 192 School Street until early- to mid-June 2016.

into the residence at 185 Metropolitan Avenue. Since that date, officers have observed
SANTIAGO-CRUZ's vehicle parked on the street near the residence at 185 Metropolitan
Avenue in Roslindale, Massachusetts, at very early hours of the morning on multiple days. In
contrast, prior to May 5, 2016, SANTIAGO-CRUZ's vehicle was observed multiple times
parked in the rear of 192 School Street. Massachusetts RMV records reflect that SANTIAGO-
CRUZ recently amended his driver's license from 192 School Street to the SANTIAGO-CRUZ
Residence. Massachusetts RMV records further reflect that the SANTIAGO-CRUZ Toyota
Tacoma is registered in SANTIAGO-CRUZ's name at the SANTIAGO-CRUZ Residence.
Agents have observed SANTIAGO-CRUZ entering and leaving the building at 185 Metropolitan
Avenue in Roslindale through the rear entrance. As recently as July 16, 2016, data from the GPS
device attached to the SANTIAGO-CRUZ Toyota Tacoma indicates that the SANTIAGO-CRUZ
Toyota Tacoma was parked overnight in the vicinity of the SANTIAGO-CRUZ Residence, thus
indicating that SANTIAGO-CRUZ is continuing to reside at this location.

19.     As will be discussed, among other things, agents observed SANTIAGO-CRUZ
enter the building at 185 Metropolitan Avenue in Roslindale while carrying a suspicious parcel
that had been sent from Puerto Rico and delivered to 192 School Street (June 3, 2016).

20.     47 Winthrop Street, Apartment 5, Framingham, Massachusetts ("the REYES
Residence"): I believe that this address is REYES's current residence. Massachusetts RMV
records indicate that REYES lives at 47 Winthrop Street in Framingham. As recently as July 16,
2016, I have confirmed with the mail carrier for this address that REYES receives mail at this
address. I am aware that this address is a rooming house. On July 15, 2016, I confirmed with
REYES's federal probation officer that REYES currently lives in Apartment 5 in 47 Winthrop

10

Street. I also have further confirmed with REYES's federal probation officer the location of this

Apartment within 47 Winthrop Street.

21.     As will be discussed below, USPS records reflect that REYES received a number

of suspicious parcels from Puerto Rico that were addressed to REYES at 45 Winthrop Street in

Framingham. 45 Winthrop Street is contained within a single, standalone building that consists

of both 45 and 47 Winthrop Street. There are separate front entrance doors for 45 Winthrop

Street and 47 Winthrop Street that are a few feet apart from the other. On various occasions,

surveillance officers observed REYES take the parcels into 47 Winthrop Street, where it

appeared that REYES opened the parcels and removed their contents.[2] On at least two

occasions, surveillance officers observed SANTIAGO-CRUZ meet with REYES, where it

appeared that SANTIAGO-CRUZ received something from REYES. Moreover, on July 18,

2016, surveillance officers observed REYES open a suspicious Priority Mail parcel that had been

shipped to him from Puerto Rico, place a box from that suspicious parcel into his vehicle, and

drive away. During a subsequent consent search after a traffic stop, officers seized

approximately one kilogram of a white compressed powder that field-tested positive for cocaine.

22.     404 Technology Center Drive, #3112, Stoughton, Massachusetts ("the

MORALES Residence"): I believe that MORALES resides at this location. This residence is an

apartment in a four-story building housing numerous apartments. MORALES's name is listed

on the mailbox for apartment 3112. According to the apartment complex manager, apartment

---

[2] On two occasions (April 12 and May 20), surveillance officers have observed REYES
– a short while after taking a suspicious parcel from Puerto Rico into 47 Winthrop Street –
reemerge from the building and discard the empty parcel box in a recycling container on the
porch shared by 45 and 47 Winthrop Street.

3112 is leased by Karen BUENO and the lease lists MORALES as the second tenant.

Massachusetts RMV records for the MORALES Ford F-350, which is owned by MORALES,

lists the MORALES Residence as the residential address for MORALES. On July 15, 2016, I

confirmed with the regular mail carrier for 404 Technology Center Drive that MORALES is

continuing to receive mail at this location.

23.     As will be discussed below, surveillance officers have observed MORALES with

FONSECA-RIVERA immediately after FONSECA-RIVERA took possession of suspicious

parcels from Puerto Rico. On a number of occasions, FONSECA-RIVERA and MORALES

then traveled to the MORALES Residence. On four different occasions, agents have retrieved

empty suspicious parcels after FONSECA-RIVERA discarded the empty parcel in the trash. A

well-trained and reliable certified drug-detecting canine alerted to the parcels, thus indicating the

presence of narcotic odor. Additionally, agents have retrieved trash that was discarded by either

MONTALVO or FONSECA-RIVERA near 404 Technology Center Drive. This trash contained,

among other things, plastic bags that field-tested positive for the presence of cocaine and other

identifying documents linked to MORALES.

24.     41B Mathewson Drive, Weymouth, Massachusetts ("41B Mathewson Drive"):

MORALES operates a car wash at this location. During a traffic stop in May 2016, MORALES

provided a Massachusetts State Police Trooper with a business card for a car wash that

MORALES said he operated. The business card indicated that "Angel's Auto Detailing and

Handwash" was at this location and listed (857) 312-2276 as the phone number for the business

(hereinafter "the MORALES Telephone"). Data from the GPS device attached to the

MORALES Ford F-350 indicates that the vehicle was in the vicinity of this location as recently

as July 15, 2016.   Footage from a pole camera placed directly across the street from 41B

Mathewson Drive also confirmed that MORALES and FONSECA-RIVERA, along with the

MORALES Ford F-350, were at 41B Mathewson Drive on July 15, 2016.

25.     Agents have observed FONSECA-RIVERA – after taking possession of a

suspicious parcel from Puerto Rico – drive to this location and enter the premises (March 29,

2016).   Agents have also observed SANTIAGO-CRUZ and MONTALVO meet with

MORALES and FONSECA-RIVERA at this location immediately before a suspicious parcel

was delivered to 192 School Street and then drive directly back to this location shortly after

taking possession of the suspicious parcel (May 20, 2016).   Agents have also observed

MORALES and FONSECA-RIVERA drive directly from this location to meet an individual

with whom MORALES then appeared to engage in a hand-to-hand drug transaction (June 23,

2016).

26.     A brown two-car detached garage across the street from 188 South Central

Avenue, Quincy, Massachusetts ("the Brown Garage"):  I believe that SANTIAGO-CRUZ uses

the Brown Garage to store various items, including materials associated with his drug trafficking

activities.  On a number of occasions, agents have observed SANTIAGO-CRUZ drive to the

Brown Garage, unlock the doors, and go inside.  Agents have also observed SANTIAGO-CRUZ

exit the garage with a 2015 Harley Davidson (May 9, 2016), which is owned by SANTIAGO-

CRUZ according to Massachusetts RMV records. Data from the GPS devices attached to

vehicles operated by SANTIAGO-CRUZ (i.e., the SANTIAGO-CRUZ BMW and the

SANTIAGO-CRUZ Toyota Tacoma) indicates that SANTIAGO-CRUZ was in the vicinity of

the Brown Garage on at least 10 occasions since May 9, 2016, with the most recent visit being a three-minute visit on July 16, 2016.

27.    As will be discussed, shortly after a suspicious parcel from Puerto Rico was delivered to MONTALVO on May 28, 2016, SANTIAGO-CRUZ received from MONTALVO a white plastic bag, which SANTIAGO-CRUZ transported to, and took inside, the Brown Garage. Additionally, on May 12, 2016, SANTIAGO-CRUZ stopped at the Brown Garage for roughly 25 minutes immediately after purchasing a coffee maker, after which SANTIAGO-CRUZ went directly to a Post Office where he mailed the coffee maker to Puerto Rico with approximately $12,900 in U.S. currency wrapped in two vacuum- and heat-sealed bags hidden inside the coffee-maker. Additionally, on at least one occasion (May 9, 2016), surveillance officers have observed SANTIAGO-CRUZ meet with MORALES and FONSECA-RIVERA at the Brown Garage.

**The Receipt of Suspicious Parcels Sent from Puerto Rico**

28.    As previously mentioned, this investigation has focused on the receipt and handling by SANTIAGO-CRUZ, REYES, FONSECA-RIVERA, MORALES, MONTALVO and others of more than thirty (30) suspicious parcels sent from Puerto Rico to Massachusetts between January 2015 and the present. These suspicious parcels each weighed between approximately two and twelve pounds, bore handwritten mailing labels, were addressed from an individual to an individual, and the postage was paid in cash. With respect to the suspicious parcels, I have determined – to the extent that sender information on the parcels was available – that at least some portion of the sender information listed on the parcels was typically fictitious.

29.    The suspicious parcels sent from Puerto Rico were addressed to various locations in Massachusetts, including, among others, the following:  (a) 192 School Street (where

MONTALVO and SANTIAGO-CRUZ previously lived); (b) 45 Winthrop Street, Framingham, Massachusetts (which is in the same building as the REYES Residence); (c) 18 Washington Street, #303, Canton, Massachusetts (where FONSECA-RIVERA rents a private commercial mailbox from Postal Center USA); and (d) 141 Memorial Parkway, Randolph, Massachusetts (where both FONSECA-RIVERA and MONTALVO rent private commercial mailboxes from Postal Center USA).

30.     At various times, surveillance agents have observed SANTIAGO-CRUZ, MONTALVO, REYES, or FONSECA-RIVERA take possession of several of these suspicious parcels. Surveillance agents have also observed, on several occasions, SANTIAGO-CRUZ and MORALES drive in a manner consistent with what I believe to be counter-surveillance maneuvers (such as driving completely around a rotary to detect whether anyone is following them, pulling to the side of the road momentarily before continuing in the same direction, crossing multiple lanes of traffic to make an abrupt turn) after receiving a suspicious parcel (or the contents of a suspicious parcel).

### At Least 13 Suspicious Parcels Have Been Sent from Puerto Rico to 192 School Street, Quincy, Massachusetts

31.     Between January 2015 and June 1, 2016, at least 13 suspicious parcels were mailed from Puerto Rico to 192 School Street, Quincy, Massachusetts 02169. Through USPS records, I obtained the recipient and sender information for 11 of these suspicious parcels sent to 192 School Street. (For unknown reasons, there was no label found for two of the parcels.) Ten of the suspicious parcels were addressed to MONTALVO. The parcels each weighed between approximately four and ten pounds, bore a handwritten label, and postage for each was paid in

15

cash.  Seven of the packages addressed to MONTALVO also bore the sender last name of

MONTALVO coupled with first names of "Hilda," "Rosa," "Sussy," "Mayra," "Susana" or

"Martha."   The return addresses on these seven parcels included the city of Naranjito, Puerto

Rico 00719.  I conducted an internet query of the sender information using the online database

known as Clear.  Clear is an investigative platform that searches proprietary sources and public

records to obtain information on individuals and businesses.  I found no record of anyone with

the last name of MONTALVO and the first names of "Hilda," "Rosa," "Sussy," "Mayra,"

"Susana" or "Martha" residing in Naranjito, Puerto Rico 00719.

        32.     I arranged for surveillance and controlled deliveries of several of the suspicious

parcels discussed above.  With respect to these controlled deliveries, the suspicious parcels were

each addressed to MONTALVO.  On two occasions, however, SANTIAGO-CRUZ took

possession of the suspicious parcel after the parcel's delivery to 192 School Street.  On three

other occasions in May 2016 (May 10, 20, and 28), MONTALVO took possession of the

suspicious parcels and went back inside the building.  A short time later, MONTALVO exited

the building and, on two occasions, discarded various items, including what appeared to be the

empty shipping box from the suspicious parcel.  MONTALVO then met with SANTIAGO-

CRUZ – who arrived in the SANTIAGO-CRUZ BMW (prior to May 20, 2016) or the

SANTIAGO-CRUZ Toyota Tacoma (after May 20, 2016) – at 192 School Street shortly after the

suspicious parcels were delivered.  On two occasions (May 10 and 28, 2016), surveillance

officers observed MONTALVO give an object (an item in the shape of a tube of caulking on one

occasion and a weighted white plastic garbage bag on a second occasion) to SANTIAGO-CRUZ.

SANTIAGO-CRUZ then left and appeared to drive directly to the Brown Garage, where on one

occasion (May 28, 2016) he was seen carrying what appeared to be the item he received from MONTALVO into the Brown Garage.[3]

33.     On two of the occasions in which MONTALVO was observed taking possession of a suspicious parcel and giving something to SANTIAGO-CRUZ (May 10 and 28, 2016), MORALES and FONSECA-RIVERA also arrived 192 School Street – once in the MORALES Ford F-350 and once in the gray 2011 Jeep Wrangler.  On both of these occasions, surveillance officers observed MORALES and FONSECA-RIVERA meet with MONTALVO shortly after the suspicious parcels were delivered, and receive something from him that was similar in appearance to the object that SANTIAGO-CRUZ received from MONTALVO at 192 School Street.  Thereafter, on one occasion (May 10, 2016), MORALES and FONSECA-RIVERA then traveled directly to 404 Technology Center Drive in Stoughton, Massachusetts, where they were observed entering into the apartment building in which the MORALES Residence is located; MORALES was carrying what appeared to be the object received from MONTALVO.

34.     Three examples of the surveillance observations made during controlled deliveries to 192 School Street are set forth below.

**The May 10, 2016 Controlled Delivery**

35.     On May 9, 2016, a suspicious Priority Mail Express parcel was mailed from the Guaynabo, Puerto Rico Post Office 00970.  The parcel was a USPS Priority Mail Express box weighing four pounds five ounces, bore a handwritten label, and postage was paid for in cash.

---

[3] On May 10, 2016, surveillance officers lost sight of SANTIAGO-CRUZ after he left 192 School Street in the SANTIAGO-CRUZ BMW.  A short while later, the surveillance officer drove by the Brown Garage, where he observed the empty SANTIAGO-CRUZ BMW parked in front of the Brown Garage.

The parcel was addressed to "Jorge Montalvo, 192 School St., Quincy, MA 02169" and bore a

return address of "Martha Montalvo, RD. 164 KM 4.2 Bo. Guadiana Int. Naranjito P.R. 00719."

The return address on this parcel was the same return address on several of the parcels addressed

to REYES and is non-deliverable per the Naranjito, Puerto Rico Postmaster. The parcel also

bore a second return address of "Box 1119, Guaynabo PR 00970," which is undeliverable as

there is no indication as to whether "Box 1119" is a post office box, highway contract route box,

or private mailbox delivery.

36.     At approximately 11:30 a.m. on May 10, a USPS letter carrier delivered the parcel

directly to MONTALVO. MONTALVO took the parcel and went inside the building at 192

School Street. At approximately 11:34 a.m., MONTALVO exited the front door of the building

at 192 School Street and placed items in the numerous recycling bins located on the front porch.

One of the items appeared to be a Priority Mail Express box.

37.     At approximately 1:08 p.m. on May 10, 2016, MORALES and FONSECA-

RIVERA arrived in the MORALES Ford F-350 at 192 School Street and parked in front of the

building. Both men remained in the vehicle. At approximately 1:10 p.m., MONTALVO exited

the front door of 192 School Street carrying a white round cylindrical object in his right hand

that had the size and appearance similar to a tube of caulking. MONTALVO entered the rear

passenger door of the MORALES Ford F-350. Approximately one minute later, MONTALVO

exited the MORALES Ford F-350 empty-handed and returned to 192 School Street.

38.     The MORALES Ford F-350 then departed the area and traveled directly to 404

Technology Center Drive in Stoughton, Massachusetts. MORALES parked the MORALES

Ford F-350 near the building in which the MORALES Residence is located. MORALES and

FONSECA-RIVERA exited the MORALES Ford F-350. Both men walked toward the apartment building, with MORALES carrying under his left arm an object that appeared to be the same white cylindrical tube that MONTALVO had carried out of 192 School Street. Both men entered the apartment building in which the MORALES Residence is located.

39.     Meanwhile, back at 192 School Street in Quincy, Massachusetts, surveillance officers observed the SANTIAGO-CRUZ BMW arrive at 192 School Street at approximately 1:44 p.m. MONTALVO exited the building, carrying a white plastic bag which appeared to contain a weighted object. MONTALVO went directly to the SANTIAGO-CRUZ BMW and entered the vehicle. Approximately one minute later, the trunk of the SANTIAGO-CRUZ BMW opened. At that point, SANTIAGO-CRUZ and MONTALVO exited the SANTIAGO-CRUZ BMW. SANTIAGO-CRUZ placed an object in the trunk of the SANTIAGO-CRUZ BMW, while MONTALVO placed a white plastic bag in a trash can on the front porch. The surveillance officer identified the object that SANTIAGO-CRUZ placed in his trunk as similar in color, size and shape to the object MONTALVO carried to the MORALES Ford F-350 approximately 40 minutes earlier. MONTALVO then returned to 192 School Street, and SANTIAGO-CRUZ drove away. A surveillance agent attempted to follow the SANTIAGO-CRUZ BMW, but lost the vehicle. A short while later, the surveillance agent drove by the Brown Garage, where he observed the empty SANTIAGO-CRUZ BMW parked in front of the Brown Garage.

### The May 28, 2016 Controlled Delivery

40.     A suspicious USPS Priority Mail parcel that was sent from the Coto Laurel Puerto Rico Post Office on May 25, 2016. This parcel weighed nine pounds eight ounces, the address

label was handwritten, and postage was paid for in cash.  The parcel was addressed to "Jorge

Montalvo, 192 School St., Quincy, MA 02169" and bore a return address of "Mario Murtiz, Glen

Vievo Gardens, Calle E-12 M #17, Ponce, P.R. 00730."  According to a USPIS analyst in Puerto

Rico, the return address although written improperly is valid; however, no one named "Mario

Murtiz" receives mail at this address.

     41.    At approximately 10:36 a.m. on May 28, 2016, a USPS letter carrier delivered the

suspicious parcel to MONTALVO at 192 School Street.  MONTALVO took the parcel and went

back inside the building.  At approximately 11:14 a.m., MONTALVO exited the front door of

the building, placed items in the numerous recycling bins located on the front porch, and then

went back into the house.

     42.    At approximately 11:37 a.m., MONTALVO again exited the front door of the

building, this time carrying a large white plastic trash bag that appeared full.  MONTALVO

placed the trash bag on the porch beside the recycling bins, and then sat down on the opposite

side of the front porch.  Approximately three minutes later, SANTIAGO-CRUZ arrived in the

SANTIAGO-CRUZ Toyota Tacoma.  SANTIAGO-CRUZ parked the vehicle on the street

approximately 30 feet past 192 School Street and remained in the vehicle.  When the

SANTIAGO-CRUZ arrived, MONTALVO immediately stood up, retrieved the large white

plastic trash bag, and walked to the vehicle.  Surveillance officers could not see whether

MONTALVO placed the white trash bag in the bed of the vehicle or inside the cab.

MONTALVO briefly entered the vehicle.  MONTALVO then returned empty-handed to 192

School Street and went inside.  SANTIAGO-CRUZ then drove from 192 School Street directly

to the Brown Garage, where a surveillance officer observed SANTIAGO-CRUZ enter the Brown

Garage carrying what appeared to be the white plastic bag from MONTALVO.

43.     At approximately 11:50 a.m. that same morning, MORALES and FONSECA-

RIVERA arrived at 192 School Street in the gray 2011 Jeep Wrangler.  The gray 2011 Jeep

Wrangler parked in front of the building, and both MORALES and FONSECA-RIVERA

remained in the vehicle.  At approximately 11:55 a.m., MONTALVO exited the front door of

192 School Street carrying another large white plastic trash bag that was weighted down by an

object.  MONTALVO entered the gray 2011 Jeep Wrangler with the bag.  The gray 2011 Jeep

Wrangler then departed the area at approximately 12:02 p.m. with MORALES, FONSECA-

RIVERA, and MONTALVO in the vehicle.  Because the gray 2011 Jeep Wrangler began to

drive in a manner consistent with counter-surveillance maneuvers, surveillance officers ceased

surveillance shortly thereafter.

**The June 3, 2016 Controlled Delivery**

44.     On June 1, 2016, another suspicious parcel was mailed via USPS Priority Mail

from Puerto Rico.  This parcel weighed ten pounds four ounces, bore a handwritten label, and

postage was paid for in cash.  The parcel was addressed to "Jorge Montalvo, 192 School St.,

Quincy, MA 02169" and bore a return address of "Frank Aransamendi, Bario Belgira 3260 Calle

Cruz, Ponce, PR 00717."  Using the Clear database, I found no record of anyone named "Frank

Aransamendi" on the island of Puerto Rico.

45.     At approximately 10:55 a.m. on June 3, 2016, a USPS letter carrier delivered the

suspicious parcel to the front porch of 192 School Street and left the parcel by the front door.  At

approximately 11:02 a.m., an unknown white male exited the building at 192 School Street,

picked up the suspicious parcel, and then carried it back into the building. At approximately

12:20 p.m., SANTIAGO-CRUZ arrived at 192 School Street driving the SANTIAGO-CRUZ

Toyota Tacoma. SANTIAGO-CRUZ entered the building at 192 School Street via the front

door. A few minutes later, SANTIAGO-CRUZ exited 192 School Street, carrying what

appeared to be the suspicious parcel that had been delivered earlier that morning. SANTIAGO-

CRUZ placed the parcel in the back seat of the SANTIAGO-CRUZ Toyota Tacoma and drove to

the SANTIAGO-CRUZ Residence, where he parked on the street near the building.

SANTIAGO-CRUZ exited his vehicle with the suspicious parcel and carried the parcel into the

rear side door of the building in which the SANTIAGO-CRUZ Residence is located.

### At Least Seven Suspicious Parcels Have Been Sent from Puerto Rico to 45 Winthrop Street, Framingham, Massachusetts

46.     There have been at least seven (7) suspicious parcels sent from Puerto Rico to 45

Winthrop Street, Framingham, Massachusetts between March 2016 and July 14, 2016. They

each bore a handwritten label, and postage for each was paid in cash. These parcels were

addressed to "Carlos Reyes, 45 Winthrop Street, Framingham, MA 01702." 45 Winthrop Street

in Framingham, Massachusetts is contained within a single, standalone building that consists of

both 45 and 47 Winthrop Street. As discussed, the REYES Residence is located in 47 Winthrop

Street.

47.     Five of the seven parcels addressed to REYES each bore a return address of "RD

#164 KM 4-2, Bo Guadiana Int., Naranjito, P.R. 00719." I contacted the Postmaster in

Naranjito, Puerto Rico and learned that the return address was non-deliverable. The five parcels

also listed different senders with the last name "REYES." Using the online Clear database, I

determined that these sender names appear to be fictitious as there was no record of anyone by those names living in Naranjito, Puerto Rico.

48.     I arranged for surveillance and controlled deliveries of several of these suspicious parcels.  Surveillance officers observed REYES accept receipt of suspicious parcels delivered to 45 Winthrop Street in Framingham, Massachusetts on April 12, April 23, and May 20.  On each of these occasions, REYES then took the parcel into the front door of 47 Winthrop Street.  A short while later, REYES exited the building and was observed discarding material into a trash barrel.

49.     Within an hour of one of the parcel's delivery on April 12, 2016, SANTIAGO-CRUZ arrived in the SANTIAGO-CRUZ BMW at the delivery location and entered the building at 47 Winthrop Street.  Approximately nine minutes later, SANTIAGO-CRUZ exited the building carrying a light brown plastic with a weighted object inside.  Similarly, SANTIAGO-CRUZ arrived in the SANTIAGO-CRUZ BMW at the delivery location within an hour of the suspicious parcel's delivery on April 23, 2016, and met with REYES.  I observed REYES carrying an object in a white plastic bag as he walked with SANTIAGO-CRUZ toward the SANTIAGO-CRUZ BMW.  Minutes later, I observed the two men in the SANTIAGO-CRUZ BMW as it drove to another location.  At this second location, I observed SANTIAGO-CRUZ exit the vehicle, carrying an object similar to the object that REYES had been observed carrying toward the car earlier.  Finally, with respect to the delivery on May 20, 2016, I observed REYES, after taking possession of the parcel, carrying a weighted plastic bag as he walked toward the rear of the building.  A minute later, I observed REYES driving a rental vehicle, which traveled

to a Toyota dealership in Braintree, Massachusetts.  A surveillance officer observed REYES

meet with SANTIAGO-CRUZ (and later with MORALES and FONSECA-RIVERA).

**The July 18, 2016 Controlled Delivery**

50.     On July 14, 2016, another suspicious Priority Mail parcel was sent from Puerto

Rico addressed to "Carlos Reyes, 45 Winthrop Street, Framingham, MA 01702."  The parcel was

a brown U.S. Postal Service Priority Mail box measuring 20" long, 14" wide and ten inches

deep.  The parcel weighed nine pounds, fourteen ounces, had a handwritten address label, and

postage was paid for in cash.  The parcel bore a return address of "Luis Martinez, Urb. Villa del

Encanto, Calle #8 h-2, Juana Diaz, PR 00795."  Using the online database known as Clear, I

found a number of individuals named "Luis Martinez" in Juana Diaz, Puerto Rico; however,

none of them had an address of "Urb. Villa del Encanto, Calle #8 h-2, Juana Diaz, PR 00795."

According to the Juana Diaz Puerto Rico Post Office, the return address on the suspicious parcel

is valid; however, the sender name is not known to receive mail at that address.

51.     On July 16, 2016, I made arrangements with Officer Richard Seibert of the

Braintree Police Department and requested that he and his narcotic-trained canine "Lucky"

review the parcel for the scent of controlled substances.  Officer Seibert arrived at the Braintree

Post Office with "Lucky" as arranged in order to review the parcel.  Officer Seibert has been

employed with the Braintree Police Department for eleven years and has been assigned to the

canine unit for the last six years.  Officer Seibert advised that Lucky is a seven-year old Labrador

retriever.  Officer Seibert advised that he uses Lucky in the detection of controlled substances in

different situations, including within sealed packages shipped through the U. S. Mail and other

courier services.  Officer Seibert and Lucky have attended and successfully completed a

twelve-week training program with Director Ken Ballinger from the Barnstable County Sheriff's Office.  Lucky received a certificate for this training and is certified to detect the presence of narcotic odors, including but not limited to marijuana, hash, cocaine, crack, heroin, ecstasy and methamphetamine.  Officer Seibert advised that this certification was most recently updated in March 2016, and that this certification is still in effect.  Officer Seibert advised that Lucky is a hand-fed food drive dog, meaning that he eats only when he finds the target odor (narcotic odor). As a result of this type of training, Lucky and Officer Seibert are required to train every day for Lucky's meals.  Officer Seibert further advised that he and Lucky, per policy, complete sixteen hours of in-service training per month with the Massachusetts Department of Correction.  Officer Seibert has advised me that Lucky has been responsible for seizures of packages containing various drugs, including marijuana, methamphetamine, cocaine, heroin, suboxone, Percocet, klonopin, wellbutrin, Oxycodone, methylone, and crack.  Officer Seibert advised that Lucky is a well-trained and reliable canine.[4]

  52.  I placed the suspicious parcel in a back room of the Braintree Post Office known not to have been contaminated by a narcotic odor and placed five additional innocent parcels in the area to act as controls.  Officer Seibert advised that "Lucky" reacted in a positive manner to the suspicious parcel, indicating the presence of a narcotic odor.  No further indications were observed in the search area.  Based on my training and experience, I know that a positive alert means that the contents of the package were narcotics or had recently been in close proximity to narcotics.

---

[4]  All references in this affidavit to a "well-trained and reliable certified drug-detecting canine" are to "Lucky."

53.     At approximately 12:34 p.m. on July 18, 2016, the suspicious parcel was delivered to 45 Winthrop Street in Framingham, Massachusetts.  At approximately 12:45 p.m., surveillance officers observed an unknown individual carry the suspicious parcel into the front door of 47 Winthrop Street.

54.     At approximately 6:56 p.m., a surveillance officer observed REYES arrive at 47 Winthrop Street and go inside the building.  Less than ten minutes later, a surveillance officer observed REYES exit the building through the front door for 47 Winthrop Street, carrying the suspicious USPS Priority Mail parcel.  A surveillance officer observed REYES go to a detached garage behind the building with the suspicious parcel.  REYES walked over to the garage, where a grey Acura was parked beside the garage.  REYES then opened the suspicious USPS Priority Mail parcel and took a square white box out of the parcel.  REYES placed the empty USPS Priority Mail parcel on the ground outside the detached garage, and put the square white box into the trunk of the grey Acura.  REYES then drove away from the REYES Residence.

55.     At approximately 7:39 p.m., a uniformed MSP Trooper observed REYES commit two traffic violations (speeding and following too close) and pulled over the grey Acura on Hammond Pond Parkway in Brookline, Massachusetts.  REYES gave consent to search the vehicle.  The MSP Trooper found the white square box in the trunk of REYES's vehicle.  The box contained an easy-bake oven.  Inside the easy-bake oven was a square-shaped compressed white powder wrapped in plastic weighing approximately one kilogram.  The substance was field-tested and produced a positive result for cocaine.

**At Least Seven Suspicious Parcels Have Been Sent from Puerto Rico to 18
Washington Street, #303, Canton, Massachusetts**

56.     Between February 25, 2016, and June 21, 2016, at least seven suspicious parcels

were sent from Puerto Rico addressed to "Roberto Fonseca-Rivera" (or "Robert Fonseca" or

"Roberto Fonseca") at 18 Washington Street, #303, Canton, Massachusetts 02021.  A business

called Postal Center USA, which rents private mailboxes, is located at 18 Washington Street in

Canton, Massachusetts.  FONSECA-RIVERA began renting private mailbox #303 on an

undetermined date.  I reviewed an undated copy of the application for private mailbox #303.  The

application bears FONSECA-RIVERA's name and contains a copy of FONSECA-RIVERA's

Massachusetts driver's license, which was used as identification when FONSECA-RIVERA

opened the mailbox.  FONSECA-RIVERA listed (939) 232-2669 as his contact number on the

application (hereinafter "the FONSECA-RIVERA Telephone").

57.     The seven suspicious parcels sent from Puerto Rico to FONSECA-RIVERA's

private mailbox weighed between approximately two and twelve pounds.  Each bore handwritten

address labels, and postage for each was paid in cash.  The listed sender names on the six parcels

were "Irene Fonseca-Rivera", "Rosa Fonseca", "Ana Fonseca", "Maritza Fonseca", "Marilyn

Fonseca" and "Jorge Rivera."  The parcels bearing the sender names "Irene Fonseca-Rivera,"

"Rosa Fonseca" and "Ana Fonseca" listed return addresses in Naranjito, Puerto Rico, whereas

the parcels bearing the sender names "Maritza Fonseca," "Marilyn Fonseca," and "Jorge Rivera"

listed return addresses in Guaynabo, Puerto Rico.  I contacted a USPIS analyst in Puerto Rico

who advised that five of the seven parcels bore return addresses that were not valid.  The

remaining two parcels bore the same valid return address coupled with sender names that were not known to regularly receive mail at the listed return address.

58.     Surveillance officers observed FONSECA-RIVERA retrieve several of these suspicious parcels after they were delivered to 18 Washington Street in Canton, Massachusetts. Twice, FONSECA-RIVERA drove alone to pick up the parcel.  On three other occasions, MORALES drove FONSECA-RIVERA to pick up the parcel in either the MORALES Ford F-350 or the gray 2011 Jeep Wrangler.  After retrieving the parcels, FONSECA-RIVERA returned to the vehicle and then traveled either to the MORALES Residence or to 41B Mathewson Drive, Weymouth, Massachusetts.

59.     On three occasions (May 6, May 20, and June 23), surveillance officers observed FONSECA-RIVERA discard the original mailing box shortly after picking up the suspicious parcel from 18 Washington Street in Canton, Massachusetts.  Surveillance agents retrieved these discarded boxes.  The mailing label and tracking numbers had been removed from two of the boxes.  A well-trained and reliable certified drug-detecting canine subsequently alerted to each of the three discarded parcels, thus indicating that the parcels had either previously contained controlled substances or had been in close proximity to controlled substances.

60.     On April 29, 2016, agents also retrieved trash that was discarded by MONTALVO as he was leaving with MORALES and FONSECA-RIVERA in the MORALES Ford F-350 from 404 Technology Center Drive in Stoughton, Massachusetts.  This trash contained, among other things, plastic baggies with their corners cut.  Many of these baggies contained white residue consistent with cocaine, and two of the baggies were field-tested with positive results for cocaine.  A sheet of paper with the words "Gordo 9505 5103 3622 6111 1994

28

67" was also recovered in the trash bag.  These numbers matched the USPS tracking number on a suspicious parcel sent from Puerto Rico that surveillance officers observed FONSECA-RIVERA retrieve from the Postal Center USA at 18 Washington Street in Canton, Massachusetts, on April 23, 2016.  In the trash bag was also a 2016 calendar for "Angel's Auto Detailing & Hand Wash, 41B Mathewson Dr., Weymouth, MA 02189."

61.     Similarly, on June 23, 2016, a surveillance officer observed FONSECA-RIVERA retrieve a suspicious Priority Mail parcel from the Postal Center USA at 18 Washington Street in Canton, Massachusetts.  This parcel was a white USPS Priority Mail box weighing four pounds 10 ounces, bore a handwritten address label, and postage was paid for in cash.  The parcel was addressed to "Roberto Fonseca, 18 Washington St., Suite 303, Canton, MA 02021" and bore a return address that was determined not to be valid delivery address in Puerto Rico.  After retrieving this parcel, FONSECA-RIVERA returned to the passenger seat of the gray 2011 Jeep Wrangler and MORALES then drove the gray 2011 Jeep Wrangler directly to 404 Technology Center Drive in Stoughton, where he parked the vehicle by a trash dumpster at the front of the apartment complex.  A surveillance officer observed FONSECA-RIVERA remove a package wrapped in red wrapping paper from inside the suspicious parcel and place the red-wrapped package under the front passenger seat.  FONSECA-RIVERA exited the gray 2011 Jeep Wrangler, discarded the remainder of the suspicious parcel in the dumpster,[5] and returned empty-handed to the gray 2011 Jeep Wrangler.  MORALES then drove the gray 2011 Jeep Wrangler into the apartment complex parking lot, where he drove in a circle in what appeared to be a

_____

[5] As mentioned earlier, a surveillance officer recovered this discarded parcel and a well-trained and reliable certified drug-detecting canine subsequently alerted to the parcel.

counter-surveillance maneuver, before then driving the gray 2011 Jeep Wrangler away from the apartment complex.

62.     According to the data from the GPS device attached to the gray 2011 Jeep Wrangler, MORALES and FONSECA-RIVERA then traveled through Quincy, Massachusetts, making one seven-minute stop in the vicinity of what appeared to be a gas station before arriving at 41B Mathewson Drive in Weymouth, Massachusetts at approximately 1:13 p.m.  An hour later, at approximately 2:12 p.m., a surveillance officer observed MORALES and FONSECA-RIVERA leave 41B Mathewson Drive in the gray 2011 Jeep Wrangler.  MORALES drove back to Quincy, Massachusetts, where he stopped on Summer Street right beside James SHEEHAN ("SHEEHAN"), who was standing on the sidewalk.[6]  SHEEHAN entered the rear passenger seat of the gray 2011 Jeep Wrangler.  Because the doors, side and rear windows, and top of the gray 2011 Jeep Wrangler were off the vehicle, a surveillance officer, who was parked directly behind the vehicle, could see directly into the vehicle.  As MORALES began driving the vehicle, SHEEHAN leaned forward toward MORALES.  MORALES looked back toward SHEEHAN, looked down, and then looked forward again.  SHEEHAN then sat up straight, and moved to the passenger side exit of the vehicle.  MORALES stopped the vehicle and SHEEHAN exited the vehicle.  From the moment that SHEEHAN entered the gray 2011 Jeep Wrangler until he exited the vehicle, the vehicle travelled less than one-tenth of a mile and approximately two minutes had elapsed.  As SHEEHAN walked directly to his car in a nearby parking lot, his left hand was clenched tightly and in a closed position, while his right hand was free and open.  Based upon

---

[6] The surveillance officers immediately identified SHEEHAN, who had been previously observed on March 29, 2016, going into 41B Mathewson Drive for three minutes and then departing.

my knowledge, training and experience, SHEEHAN's and MORALES's movements and
interaction were consistent with a "hand-to-hand" drug transaction.[7]

63.     The next day, on June 24, 2016, at approximately 11:19 a.m., a surveillance
officer observed MORALES and FONSECA-RIVERA exit the apartment building where the
MORALES Residence is located.  MORALES was carrying two white trash bags.  MORALES
drove the gray 2011 Jeep Wrangler out of a garage.  FONSECA-RIVERA placed two white trash
bags into the vehicle and entered the vehicle.  MORALES drove the vehicle to an unlocked
dumpster located by the main exit to the apartment complex.  FONSECA-RIVERA then
discarded the two white trash bags into the dumpster, after which he reentered the gray 2011
Jeep Wrangler.  MORALES then drove the vehicle away from the apartment complex.  Agents
retrieved the discarded trash bags and seized, among other things, paperwork identifying the
trash as coming from MORALES (including a CVS pharmacy prescription label in MORALES's
name and bearing the address for the MORALES Residence); boarding passes in MORALES's
name from Boston to Puerto Rico on June 16, 2016, and from Puerto Rico back to Boston on
June 20, 2016; several items consistent with the packaging of a kilogram of cocaine (including
used red/pink wrapping paper similar to that seen by surveillance officers on June 23 when
FONSECA-RIVERA removed a package from the suspicious parcel; green plastic/cellophane
wrap; used black wrapping paper; clear plastic/cellophane wrap; and multiple newspapers from

_____

[7]  This belief is corroborated by the fact that SHEEHAN was subsequently stopped by a
MSP Trooper for a traffic violation shortly after leaving the area.  During a subsequent inventory
search of SHEEHAN's vehicle, the MSP Trooper seized a small blue plastic zip lock bag that
contained a white powdery substance consistent in appearance with cocaine, a bag containing a
green vegetable substance consistent in appearance with marijuana, and a round white pill
consistent in appearance with Oxycontin.

Puerto Rico, some of which had blue tape attached to them); and a cut plastic "Food Saver" heat-sealed bag and a plastic ziplock bag, both of which contained white powder residue that field-tested positive for cocaine.

### At Least Two Suspicious Parcels Have Been Sent from Puerto Rico to 141 Memorial Parkway, Randolph, Massachusetts

64.       Between May 26, 2016, and June 30, 2016, at least two suspicious parcels have been sent from Puerto Rico to 141 Memorial Parkway in Randolph, Massachusetts.  Postal Center USA has another branch at this address.  FONSECA-RIVERA began renting private mailbox #135 on June 29, 2016.  The application for this mailbox contains a copy of FONSECA-RIVERA's Massachusetts driver's license and lists the FONSECA-RIVERA Telephone as his contact number.  MONTALVO began renting private mailbox #172 at this location on March 26, 2016.  The application for mailbox #172 contains a copy of MONTALVO's Massachusetts identification card and lists (617) 363-6099 as his contact number (hereinafter "the MONTALVO Telephone").

65.       One of the suspicious parcels sent from Puerto Rico was addressed to MONTALVO's private mailbox; the other was addressed to FONSECA-RIVERA's private mailbox.  The two parcels each weighed approximately four pounds eleven ounces.  Each bore handwritten address labels, and postage for each was paid in cash.  Both of the parcels were mailed from the same Post Office branch in Puerto Rico, and both appeared to have fictitious information listed in the sender information.

66.       Surveillance was conducted with respect to the suspicious parcel that was addressed to FONSECA-RIVERA's mailbox.  This parcel, which was a white Priority Mail

32

parcel addressed to "Roberto Fonseca," was delivered to the Postal Center USA at 141 Memorial Parkway in Randolph, Massachusetts on July 5, 2016, at approximately 11:43 a.m.

67.     At approximately 12:15 p.m. on July 5, 2016, surveillance officers observed MORALES and FONSECA-RIVERA depart 404 Technology Center Drive in Stoughton in the MORALES Ford F-350.  MORALES and FONSECA-RIVERA arrived in the parking lot for the Postal Center USA in Randolph, Massachusetts at approximately 12:22 p.m.  FONSECA-RIVERA exited the vehicle, went into the Postal Center USA store, and then returned to the MORALES Ford F-350 carrying a white Priority Mail parcel.  MORALES then drove the MORALES Ford F-350 from the parking lot.  The MORALES Ford F-350 stopped momentarily in a parking lot of a business next to a commercial dumpster, before then departing the area.

68.     A surveillance officer checked the dumpster and found the discarded Priority Mail parcel that had been delivered to FONSECA-RIVERA's mailbox at 141 Memorial Parkway in Randolph, Massachusetts.  The tracking number had been scratched off and the mailing label had been removed.  Based upon my knowledge, training, and experience, I know that experienced drug traffickers will often remove the tracking number and mailing label in an attempt to make it impossible for law enforcement to identify the sender or recipient of a discarded parcel.  A well-trained and reliable certified drug-detecting canine subsequently alerted to the discarded parcel, thus indicating that the parcel had either previously contained controlled substances or had been in close proximity to controlled substances.

**Evidence that SANTIAGO-CRUZ is Mailing Cash Drug Proceeds from Massachusetts to Puerto Rico**

69.    SANTIAGO-CRUZ has sent suspicious parcels from Massachusetts to Puerto Rico.  On April 25, 2016, a postal clerk advised me that a man, whom the postal clerk subsequently identified as SANTIAGO-CRUZ, mailed a 10-pound parcel from the Milton Post Office.  The parcel bore a handwritten label, and postage was paid in cash.  The parcel bore a return address of "Jorge Montalvo, 192 School St., Quincy, Mass 02169."  The clerk advised me that SANTIAGO-CRUZ has mailed similar parcels in the past to Puerto Rico.

70.    From security camera footage obtained from various Post Offices, identifications made by postal clerks who handled transactions, data from the GPS tracking device on the SANTIAGO-CRUZ Toyota Tacoma, surveillance observations, and my review of handwriting on labels of parcels sent to Puerto Rico, I have identified at least eleven parcels that I believe were sent by SANTIAGO-CRUZ to Puerto Rico between April 4, 2016 and July 18, 2016. Based upon my knowledge, training, and experience, as well as my participation in this investigation and the USPIS characteristics of suspicious parcels described in paragraphs 11 and 12, I believe that there is a high probability that each of these parcels contained drug proceeds or payments for drugs.

71.    To corroborate this belief, on May 13 and 24, 2016, respectively, I obtained federal "sneak and peek" warrants (No. 16-MJ-7147-JCB and No. 16-MJ-7170-JCB) for two suspicious parcels mailed by SANTIAGO-CRUZ.  Video security surveillance footage from the Post Office where SANTIAGO-CRUZ mailed each parcel depicted SANTIAGO-CRUZ sending

the parcels.  Both parcels had handwritten labels, and postage for each was paid for in cash.

Both parcels listed the sender as "Jorge Montalvo, 192 School St., Quincy, MA 02169."

72.     Inside one parcel – which was addressed to "Rafael Perez, P.O. Box 2425,

Bayamon, Puerto Rico 00960-2425" and which SANTIAGO-CRUZ prepared for shipping while

at the Quincy Post Office on May 12, 2016 – were two bundles of U.S. currency in heat- and

vacuum-sealed bags hidden inside a new coffee maker.  Each bundle bore a handwritten note

stating "6450," which indicated to me that each bundle contained $6,450 for a total of $12,900.

Subsequent investigation determined that SANTIAGO-CRUZ purchased the coffee-maker at a

Wal-Mart in Quincy, Massachusetts, earlier that morning.  According to data from the GPS

device attached to the SANTIAGO-CRUZ BMW, SANTIAGO-CRUZ was at the SANTIAGO-

CRUZ Residence immediately before purchasing the coffee maker.  The data from the GPS

device further indicates that after buying the coffee maker, SANTIAGO-CRUZ then drove to the

vicinity of the Brown Garage, where he stopped for approximately 25 minutes, before traveling

to the Quincy Post Office, where he mailed the coffee maker with the cash hidden inside it.

73.     Inside the second parcel – which SANTIAGO-CRUZ mailed on May 23, 2016 –

were four bundles of U.S. currency in heat- and vacuum-sealed plastic bags also hidden inside a

new coffee maker.  These bundles bore handwritten notes which indicated to me the total amount

of currency was $30,000.

74.     At approximately 10:28 a.m. on July 5, 2016, I received information from the

Milton Post Office that SANTIAGO-CRUZ had just purchased a brown USPS priority mail box

and a roll of clear tape.  Data from the GPS device attached to the SANTIAGO-CRUZ Toyota

Tacoma confirmed that the vehicle was parked in the vicinity of the Milton Post Office from

approximately 10:21 a.m. until approximately 10:27 a.m.  Thereafter, the SANTIAGO-CRUZ

Toyota Tacoma drove to the vicinity of the Brown Garage in Quincy, Massachusetts, where,

according to the data from the GPS device, the SANTIAGO-CRUZ Toyota Tacoma was parked

for approximately 14 minutes.  Upon leaving the vicinity of the Brown Garage, the SANTIAGO-

CRUZ Toyota Tacoma drove directly to the Weymouth Post Office, where, according to the GPS

device, it arrived at approximately 11:07 a.m.  I immediately contacted the manager of the

Weymouth Post Office, who confirmed that SANTIAGO-CRUZ was at the Post Office.

According to the manager of the Weymouth Post Office, SANTIAO-CRUZ shipped a 12-pound

Priority Mail parcel bearing a handwritten address label and paid for the postage in cash.  The

parcel was addressed to the same address as the parcel containing $12,900 that SANTIAGO-

CRUZ mailed on May 12, 2016, and bore a fictitious return address.

### The SUBJECT PARCEL

75.     According to data from the GPS device attached to the SANTIAGO-CRUZ

Toyota Tacoma, the SANTIAGO-CRUZ Toyota Tacoma was in the vicinity of the Quincy Post

Office at approximately 10:00 a.m. on July 18, 2016.  According to the manager of the Quincy

Post Office, security camera footage indicates that a white male entered the Quincy Post Office

at 10:03 a.m. and mailed the SUBJECT PARCEL at approximately 10:05 a.m.  According to the

manager of the Quincy Post Office, the security camera footage is not sufficiently clear to

determine whether SANTIAGO-CRUZ was the male who shipped the SUBJECT PARCEL.

76.     The SUBJECT PARCEL is addressed to "Rafael Perez, P.O. Box 2425,

Bayamon, Puerto Rico 00960-2425."  This is the same name and address that appeared on the

suspicious parcel that SANTIAGO-CRUZ mailed on May 12, 2016, that contained two bundles

of U.S. currency in heat- and vacuum-sealed bags totaling $12,900. (This is also the same name

and address that appeared on the parcel that SANTIAGO-CRUZ mailed on July 5, 2016.)

77.     The SUBJECT PARCEL has a handwritten label. From my review of the label,

the handwriting appears similar to the handwriting on other suspicious parcels mailed by

SANTIAGO-CRUZ to Puerto Rico. Postage for the SUBJECT PARCEL was paid for in cash.

The SUBJECT PARCEL bears a return address of "Jorge MONTALVO, 192 School Street,

Quincy, MA 02169." This return address is valid; however, as discussed previously,

MONTALVO no longer resides at 192 School Street.

78.     On July 18, 2016, I arranged for a well-trained and reliable certified drug-

detecting canine to review the SUBJECT PARCEL for the scent of controlled substances. The

SUBJECT PARCEL was placed in an area of the Quincy Post Office known not to have been

previously contaminated by a narcotic odor and other packages were placed in the search area as

controls. Upon arriving at the SUBJECT PARCEL, the well-trained and reliable certified drug-

detecting canine reacted in a positive manner, indicating the presence of a narcotic odor. No

further indications were observed in the search area.

### Probable Cause Exists to Believe that SANTIAGO-CRUZ, REYES, MORALES, FONSECA-RIVERA, and MONTALVO Are Committing the Target Offenses

79.     In sum, based on my knowledge, training and experience, as well as my

participation in the instant investigation, I believe that the conduct of SANTIAGO-CRUZ,

REYES, MORALES, FONSECA-RIVERA, and MONTALVO – including, among other things

(1) receiving suspicious parcels sent from Puerto Rico (a known source location for controlled

substances) bearing handwritten labels with fictitious return address information and postage

paid for in cash; (2) discarding the empty parcels and removing labels that might provide

information concerning the origination and destination of the parcels; (3) driving using counter-

surveillance techniques after leaving a delivery location; and (4) mailing parcels containing

hidden U.S. currency – is consistent with the established pattern of drug traffickers receiving

controlled substances from Puerto Rico.  This belief is corroborated by the fact that a well-

trained and reliable certified drug-detecting canine alerted to four empty discarded parcels,

indicating the presence of narcotics odor, and that trash discarded by MONTALVO near the

MORALES Residence contained baggies that field-tested positive for the presence of cocaine.

Moreover, this conduct is consistent with SANTIAGO-CRUZ's prior federal drug trafficking

conviction, which involved the receipt of a FedEx package containing cocaine that had been sent

from Puerto Rico.

### EVIDENCE RELATING TO THE TARGET OFFENSES IS LIKELY TO BE FOUND AT THE TARGET LOCATIONS

80.     As will be discussed below, I believe that evidence related to the Target Offenses

will be found at the five Target Locations.

#### Drug Traffickers' Use of Residences, Off-Site Locations, and Cell Phones, Generally

81.     Among the locations for which I am requesting search warrants are the residences

of SANTIAGO-CRUZ, REYES, and MORALES.  Based upon my experience and the

experience of other law enforcement officers who have participated in the execution of numerous

search warrants at the residences of drug-traffickers, I am aware that the following kinds of drug-

related evidence have typically been recovered from the search of the drug-traffickers'

residences:

a.      Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, cutting agents (e.g., baking soda or Inositol), razor blades, plastic bags, and heat-sealing devices;

b.      Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include, but are not limited to, ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units;

c.      Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for coconspirators, drug suppliers, and drug customers. Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills;

d.      Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records;

e.      Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities;

f.      Airbills, labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments;

g.      Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements,

39

photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys;

h.    Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators;

i.    Cellular telephones, and evidence that tends to identify the person having dominion and control over the cellular telephone, such as electronic address books or contact lists on the phone, call logs, saved text messages, photographs, saved usernames and passwords and documents.

82.    Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to maintain in their residences various items and records relating to their drug trafficking activities.  SANTIAGO-CRUZ, REYES, MORALES and MONTALVO have each been observed carrying suspicious parcels (or what appeared to be the contents of those parcels) into the buildings in which their respective residences are located.  Moreover, trash recovered at various times from a dumpster near 404 Technology Center Drive (where the MORALES Residence is located) contained, among other things, materials linking the trash to MORALES, wrapping consistent with a kilogram of cocaine, plastic baggies with cut corners and cocaine residue, thus indicating that drug repackaging may be taking place in at least one of the residences.  Additionally, SANTIAGO-CRUZ has twice mailed currency wrapped in heat-sealed plastic to Puerto Rico, thus suggesting he has access to a heat-sealing device.

83.    In my knowledge, training, and experience, I know that drug traffickers often maintain records of their illegal activities at the residences.  Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is

necessary to keep track of amounts paid and owed, and such records will also be maintained

close at hand so as to readily ascertain current balances.  Often drug traffickers keep ledgers or

"pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments

expected ("owe") as to the trafficker's suppliers and the trafficker's dealers.  Additionally, drug

traffickers must maintain telephone and address listings of clients and suppliers and keep them

immediately available in order to efficiently conduct their drug trafficking business.  I am also

aware that drug traffickers often maintain such documents related to their drug trafficking

activities at their residences for an extended period of time, regardless of whether they are

physically in possession of drugs on the premises.  Similarly, drug traffickers will often keep

various paraphernalia associated with the packaging, processing, diluting, weighing, and

distributing controlled substances available even when they are not currently in possession of the

actual controlled substances.

      84.    Even when drug dealers store their drugs outside their residence, I know that they

often will keep records relating to these offsite storage locations at their primary residence.  Such

documents include rental or storage property agreements and receipts.

      85.    Based upon my training and experience, as well as the training and experience of

other law enforcement agents I have worked with, I am aware that it is generally a common

practice for traffickers to conceal at their residences large sums of money, either the proceeds

from drug sales or monies to be used to purchase controlled substances.  Furthermore, drug

traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for

controlled substances.  Drug traffickers also often maintain one or more currency counting

machines to aid in counting their drug proceeds. As discussed, SANTIAGO-CRUZ sent more than $40,000 in U.S. currency to Puerto Rico in less than a two-week period in May 2016.

86.    Many experienced drug traffickers will often engage in money laundering to conceal the source of their drug proceeds and will use the proceeds to purchase legitimate investments or expensive jewelry and precious metals. In other instances, drug traffickers will combine the cash from their drug trafficking with cash deposits from other legitimate business activities in an attempt to hide their illegal conduct. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking and/or money laundering would also typically be maintained in residences.

87.    Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that drug traffickers generally try to hide cash and sensitive documents related to their drug trafficking and money laundering activities in safes or other containers so that other individuals who are at their residence do not discover these materials.

88.    Many drug dealers receive their drugs through overnight parcels and keep mailing labels and airbills both used and unused in their residence for future use. Additionally, such drug traffickers often send the proceeds of their drug sales via overnight delivery, Western Union, and/or wire to their suppliers in order to pay for a continuing supply of drugs. Such individuals will often maintain records of these transactions for a period of time in case there is a later dispute concerning what funds were transmitted and when. As discussed, a tracking number corresponding to a suspicious parcel sent from Puerto Rico to FONSECA-RIVERA's private mailbox was found in the discarded trash by the MORALES Residence.

89.     During the course of residential searches, I and other agents have also found items

of personal property that tend to identify the person(s) in residence, occupancy, control, or

ownership of the subject premises.  Evidence of occupancy, residency, rental and/or ownership

of the premises is relevant to the prosecution of the Target Offenses.  Such identification

evidence is typical of the articles people commonly maintain in their residences, such as

cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries,

utility and telephone bills, statements, identification documents, and keys.  Furthermore, I have

learned from this and other investigations that records of residency linking a person to a

particular location are durable and are reasonably likely to be maintained for long periods of time

for several reasons.  Many documents and records are largely innocuous, or at least are perceived

as such, while many documents and records have other utility.  For example, a person involved

in the trade of illegal drug is unlikely to discard passports, licenses, titles to motor vehicles, bank

books, address books and bills.  These are necessary to prove ownership – even if they are in the

name of a proxy – and they can be helpful when attempting to flee police.

90.     Based on training and experience, I know that most drug dealers regularly use

cellular telephones to communicate about their drug trafficking and money laundering activities

with customers, suppliers, and other coconspirators.  In my training and experience, I also am

aware that drug traffickers are often aware of law enforcement's use of electronic surveillance,

and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the

same time, as well as prepaid cellular phones (where the subscriber of the phone is not required

to provide personal identifying information), in an effort to thwart law enforcement's use of

electronic surveillance.  Because cellular telephones are often a principal means of

communication, drug dealers typically keep the phones in close proximity or at their residence.

Additionally, in my experience, many drug dealers do not dispose of their cellular telephones

when getting a new number, but instead just discard them in various locations in their residences.

As a result, it is common to recover not only paper records pertaining to the use of the cellular

phone by drug dealers, such as bills, call detail records, statements, and other documents, but the

cellular telephones themselves, from drug dealers' residences.

91.     Through various means, I have identified cellular telephone numbers used by

SANTIAGO-CRUZ, REYES, MONTALVO, MORALES, and FONSECA-RIVERA.  Bank

records at Eastern Bank where SANTIAGO-CRUZ maintains a checking account lists (774) 386-

9199 as a contact number for SANTIAGO-CRUZ (hereinafter "the SANTIAGO-CRUZ

Telephone").  The SANTIAGO-CRUZ Telephone is a T-Mobile cellular telephone subscribed to

in the name of "Berry White" at a non-existent address in Weymouth, Massachusetts.  The

United States Probation Officer supervising REYES on supervised release confirmed that (617)

820-2670) is REYES's contact number (hereinafter "the REYES Telephone").  The REYES

Telephone is an AT&T cellular telephone with no subscriber name.  The MONTALVO

Telephone is a Sprint cellular telephone subscribed to in the name of "Roberto Monteca, PO Box

15955, Shawnee Mission, KS 66285."  The MORALES Telephone (which was on the business

card that MORALES provided to an MSP Trooper) is a T-Mobile cellular telephone subscribed

to in the name of "Francisco Guzma" at a non-existent address in Boston.  The FONSECA-

RIVERA Telephone is a T-Mobile cellular telephone with no subscriber name listed.

92.     Telephone records confirm contacts between the various phones.  For example,

between January and April 2016, the SANTIAGO-CRUZ Telephone had 500 or more contacts

with the MONTALVO Telephone, with the MORALES Telephone, and with the REYES

Telephone; the SANTIAGO-CRUZ Telephone also had at least 75 contacts with the FONSECA-

RIVERA Telephone. Similarly, between April 3, 2016, and June 27, 2016, the MONTALVO

Telephone had more than 350 contacts with the MORALES Telephone and had more than 480

contacts with the FONSECA-RIVERA Telephone.

93.      Based upon my knowledge, training and experience, I know that a cellular

telephone is a handheld wireless device used primarily for voice communication through radio

signals. These telephones send signals through networks of transmitter/receivers called "cells,"

enabling communication with other wireless telephones or traditional "land line" telephones. A

wireless telephone usually contains a "call log," which records the telephone number, date, and

time of calls made to and from the phone. In addition to enabling voice communications,

wireless telephones now offer a broad range of capabilities. These capabilities include, but are

not limited to: storing names and phone numbers in electronic "address books;" sending,

receiving, and storing text messages and email; taking, sending, receiving, and storing still

photographs and moving video; storing and playing back audio files; storing dates, appointments,

and other information on personal calendars; and accessing and downloading information from

the Internet. Wireless telephones may also include global positioning system ("GPS")

technology for determining the location of the device. Based on my training and experience, I

know that many cellular telephones have the capabilities described above.

94.      Seizure of devices containing this information will provide information relating to

coconspirators and accomplices. I know, based upon my training and experience, as well as

consultation with other investigators, that individuals who sell illegal drug typically use cellular

telephones to communicate with their suppliers, their customers, and with other coconspirators, and that they communicate both via both voice calls and via email and/or text messaging.  I also know that persons who sell illegal drugs regularly keep records of their illegal activities.  These records can include, but not limited to, contact list of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific controlled substances preferred by or ordered by specific customers.  Individuals engaged in drug trafficking activities often take photographs of their closest confederates.  Records of drug trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on cellular telephone, electronic/digital storage device and/or a computer.  In the case of electronic or digital media, the information can be maintained on the device itself or on portable digital storage media, making it easier to conceal.  I know that individuals involved in the sale of drug are very secretive in their activity in an effort to avoid detection, arrest and prosecution, and such persons usually are careful to deal only with someone they know, or who have been introduced to them by someone they know.  Additionally, in the conduct of their activities, they frequently employ code words or colloquial jargon when writing, texting or speaking on the telephone or in person, being careful to avoid the use of actual names of persons or narcotic substances, which, if overheard or seen, would be incriminating to themselves or their criminal associates.  From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachments B and C on their cellular telephones.

95.    Additionally, I know that many drug traffickers often use computers, cellular telephones, or other electronic devices having internet capabilities in order to communicate

quickly and economically with their suppliers via the internet and/or email.  Additionally, when
the value of the drugs being ordered and transported is large, drug traffickers will often use a
computer, cellular telephone, or other electronic devices having internet capabilities to monitor
the progress of the package while en route via databases such as the USPS Track 'n Confirm
database and/or to receive emails tracking the progress of packages containing drugs or drug
proceeds that have been shipped.  I am also aware that individuals frequently use computers to
create and store records of their actions by communicating with others through e-mail, instant
messages, and updates to online social-networking websites; drafting letters; keeping their
calendars; arranging for travel; storing pictures; researching topics of interest; buying and selling
items online; and accessing their bank, financial, investment, utility, and other accounts online.
Additionally, many cellular phones today have a GPS navigation device on the phone.
Examination of the GPS data on a cellular phone can provide valuable evidence as to the
locations where drug traffickers meet with coconspirators, including their sources of supply, and
can aid in identifying those individuals.  Additionally, review of GPS data can aid in identifying
offsite locations where drug traffickers store drugs, maintain bank accounts, and conceal their
drug proceeds.

96.     From USPS records and T-Mobile records, I have determined that SANTIAGO-
CRUZ has used the SANTIAGO-CRUZ Telephone to make delivery status queries to track the
likely delivery date and time of suspicious parcels that were sent from Puerto Rico to
MONTALVO at 192 School Street, Quincy, Massachusetts, and to REYES at 45 Winthrop
Street, Framingham, Massachusetts.

97.     Based on the foregoing, I believe there is probable cause to believe that evidence

of the commission of the Target Offenses, more specifically, the items set forth in Attachment B,

will be found in the SANTIAGO-CRUZ Residence, the MORALES Residence, and the REYES

Residence.

98.     Based upon my knowledge, training, and experience, I also know that some drug

traffickers also keep certain items pertaining to their drug trafficking activities outside their

residences in order to avoid detection.  Among the items that are commonly found in off-site

locations are the items set forth in Attachment C.  In this case, as discussed, the GPS data from

vehicles being driven by SANTIAGO-CRUZ indicated that SANTIAGO-CRUZ stopped at the

Brown Garage for between approximately 14 and 25 minutes immediately before sending a

Priority Mail parcel from Massachusetts to Puerto Rico.  Moreover, I know that two of the

Priority Mail parcels sent by SANTIAGO-CRUZ to Puerto Rico contained bundles of U.S.

currency wrapped in heat-sealed plastic.  Additionally, as discussed above, SANTIAGO-CRUZ

was been observed taking into the Brown Garage a white plastic bag that he received from

MONTALVO within an hour after the delivery of a suspicious parcel from Puerto Rico.  As a

result, I believe that there is probable cause to believe that SANTIAGO-CRUZ uses the Brown

Garage to store the items set forth in Attachment C relating to drug trafficking at the Brown

Garage.

99.     Similarly, I believe that there is probable cause to believe that the items found in

Attachment C will be found at 41B Mathewson Drive, Weymouth Massachusetts (Angel's Auto

Detailing and Handwash).  As discussed above, SANTIAGO-CRUZ, MONTALVO,

MORALES, and FONSECA-RIVERA have all been seen meeting at this location immediately

before a suspicious parcel from Puerto Rico was delivered to 192 School Street. Additionally, on one occasion (May 20, 2016), MONTALVO, within approximately one hour of taking possession of a suspicious parcel from Puerto Rico at 192 School Street, was observed carrying a light brown bag with a weighted object from 192 School Street and traveling directly to 41B Mathewson Drive in Weymouth, Massachusetts, where he entered the premises carrying what appeared to be the same light brown bag with a weighted object. Moreover, MORALES has been observed engaging in what appeared to be a hand-to-hand drug transaction immediately after leaving 41B Mathewson Drive.

100.    My awareness of these drug trafficking practices, arises from my own involvement in prior drug investigations and searches during my career as a law enforcement officer, my involvement on a number of occasions in debriefing confidential sources and cooperating individuals in prior investigations, as well as what other law enforcement agents and officers have advised me when relating the substance of their similar debriefings and the results of their own drug investigations, and other information provided through law enforcement channels.

## CONCLUSION

101.    Based upon the evidence set forth above, as well as my knowledge, training and experience, I also submit that there is probable cause to believe that at the SANTIAGO-CRUZ Residence, the REYES Residence, and the MORALES Residence described in Attachments A-1, A-2, and A-3, respectively, there exists evidence, fruits, and instrumentalities of drug trafficking and money laundering activities in violation of the Target Offenses as set forth in Attachment B.

Accordingly, I respectfully request that search warrant be issued for the searches of the premises described in Attachment A-1 through A-3 for the items detailed in Attachment B.

102.    Additionally, based upon the evidence set forth above, as well as my knowledge, training and experience, I submit that there is probable cause to believe that at 41B Mathewson Drive and at the Brown Garage, described in Attachments A-4 and A-5, respectively, there exists evidence, fruits, and instrumentalities of drug trafficking and money laundering activities in violation of the Target Offenses as set forth in Attachment C.  Accordingly, I respectfully request that search warrants be issued for the searches of the premises described in Attachment A-4 and A-5 for the items detailed in Attachment C.

103.    Additionally, based upon the evidence set forth above, as well as my knowledge, training and experience, I submit that there is probable cause to believe that the SUBJECT PARCEL, described in Attachment A-6, contains proceeds from the sale of controlled substances (such as cash or money orders), payment for an additional quantity of controlled substances, or other documents constituting evidence of the Target Offenses as set forth in Attachment D. Accordingly, I respectfully request that a search warrant be issued for the search of the SUBJECT PARCEL described in Attachment A-6 for the items detailed in Attachment D.

104.    Disclosure of the contents of this affidavit, the applications and requested search

warrants could compromise and jeopardize the ongoing investigation.  For that reason, I request

that the applications and search warrants be sealed until further order of the Court.

Stephen P. Dowd
Postal Inspector
U.S. Postal Inspection Service


Subscribed to and sworn before me on this
the 18th day of July 2016.

HON. Marianne B. Bowler
United States Magistrate Judge
District of Massachusetts

51

## ATTACHMENT A-1

### (Description of Property to be Searched)

185 Metropolitan Avenue, Apt. 3, Roslindale, Massachusetts:  Apartment 3 is contained within a three-story structure with light blue siding and white-framed windows situated on the south side of Metropolitan Avenue facing northeast.  The residence is on the corner of Metropolitan Avenue and Granada Avenue.  The number "185" is affixed to a pillar on the front porch of the residence.  The rear entrance door has a white storm door and metal awning above it.  There is a chain link fence around the rear of the property.  Apartment 3 is located on the upper floor.

Two photographs of the building located at 185 Metropolitan Avenue in Roslindale, Massachusetts are attached.



## ATTACHMENT A-2

### (Description of Property to be Searched)

47 Winthrop Street, Apartment 5, Framingham, Massachusetts:  Apartment 5 is located within a

two-story structure situated on the north side of Winthrop Street facing south.  The building has

very light-colored green siding, yellow trim and a long driveway to the left of the

residence.  There is a concrete walkway between two large trees that leads to the front

porch.  There are green shrubs on either side of the front porch.  There are separate entry doors

on the porch to 45 and 47 Winthrop Street.  Each door has a storm door with the numbers "45"

and "47" attached.  There are mailboxes between the two doors.   Apartment 5 is accessed by

entering into the building through the door marked "47," and then going up the stairs which lead

to the second floor.  The doorway to Apartment 5 is located to the left at the top of the stairs.


A photograph of the building located at 45-47 Winthrop Street in Framingham, Massachusetts

are attached.



## ATTACHMENT A-3

### (Description of Property to be Searched)

404 Technology Center Drive Unit 3112 Stoughton, Massachusetts:  Unit 3112 is inside a building that is part of the Bell Stoughton Apartment complex.  The building at 404 Technology Center Drive is a four-story, multi-unit residential building. The exterior is comprised of brick and beige siding with white trim and red shutters. There is a paved parking lot around the building.  Access to the building at 404 Technology Center Drive is through a glass side door. Unit 3112 is on the first floor.  The apartment door is white in color with the numbers "3112" in black on the wall to the left of the door.

Photographs of the entrance to the building located at 404 Technology Center Drive and of the front door for Unit 3112 inside of 404 Technology Center Drive are attached.







## ATTACHMENT A-4

### (Description of Property to be Searched)

41B Mathewson Drive, Weymouth, Massachusetts:  41B Mathewson Drive is contained within a two-story, tan- and brown-colored, multi-unit commercial building.  This commercial building is located on the north side of Mathewson Drive facing south.  Unit 41B is accessed through a large white colored garage door and a smaller brown colored door to the right bearing "41B" in black numbers.  Unit 41B is the second unit from the right end of the building.  There is a paved parking lot in front of the building.

Photographs of the building and the front door for Unit 41B are attached.  The garage door for Unit 41B in the picture of the building is open and the front door for Unit 41B is to the right of that open garage door.





## ATTACHMENT A-5

**(Description of Property to be Searched)**

A brown two-car detached garage located across the street from 188 South Central Avenue, Quincy, Massachusetts: This two-car garage is located on the east side of South Central Avenue in the Wollaston section of Quincy, Massachusetts facing west.  The two-car garage is situated across from a single-family residence located at 188 South Central Avenue.  The two-car garage is painted brown on the front and left sides.  The roof is comprised of light brown shingles.  The two garage doors are affixed with padlocks.  There is a small window on the left side of the garage above a stone walkway.

A photograph of the garage is attached.



**ATTACHMENT A-6**

(Description of Property to be Searched)


SUBJECT PARCEL:  A brown Priority Mail package bearing tracking number

9505512157316200008141, weighing approximately ten pounds fourteen ounces and measuring

approximately 20 inches long, 14 inches wide, and 10 inches thick.  The SUBJECT PARCEL is

addressed to "Rafael Perez, P.O. Box 2425, Bayamon, Puerto Rico 00960-2425" and bears a

return address of "Jorge Montalvo, 192 School Street, Quincy, MA 02169."  The SUBJECT

PARCEL is currently in the custody of the United States Postal Inspection Service.

## ATTACHMENT B

### (Items to be Seized from Residences)

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute controlled substances), 843(b) (use of a communication facility during or in relation to a controlled substances trafficking offense), and 846 (conspiracy to distribute and possess with intent to distribute controlled substances); and/or 18 U.S.C. §§ 1956, 1957 (money laundering offenses) (collectively, the "Target Offenses"):

1.  Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, cutting agents (e.g., baking soda or Inositol), razor blades, plastic bags, and heat-sealing devices.

2.  Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include, but are not limited to, ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

3.  Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers. Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

4.  Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

5.  Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

6.  Airbills, labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments.

7.      Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

8.      Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

9.      Cellular telephones, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering, located in the memory of any mobile telephone, including but not limited to:

     a.      Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking or money laundering;

     b.      Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

     c.      Text messages both sent to and received from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering;

     d.      Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

     e.      GPS data;

     f.      Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

     g.      Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

     h.      All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

i.      Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

## ATTACHMENT C

### (Items to be Seized from Locations)

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute controlled substances), 843(b) (use of a communication facility during or in relation to a controlled substances trafficking offense), and 846 (conspiracy to distribute and possess with intent to distribute controlled substances); and/or 18 U.S.C. §§ 1956, 1957 (money laundering) (collectively, the "Target Offenses"):

1. Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, cutting agents (e.g., baking soda or Inositol), razor blades, plastic bags, and heat-sealing devices.

2. Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include, but are not limited to, ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds.

3. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers. Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

4. Cash, currency, and currency counting machines.

5. Cellular telephones, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering, located in the memory of any mobile telephone, including but not limited to:

   a. Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking or money laundering;

   b. Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

   c. Text messages both sent to and received from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering;

d.       Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

e.       GPS data;

f.       Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

g.       Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

h.       All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

i.       Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

## ATTACHMENT D

Items, documents, records, files, and other information that constitutes evidence, fruits, and/or other instrumentalities of violations of 21U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute controlled substances), 843(b) (use of a communication facility during or in relation to a controlled substances trafficking offense), and 846 (conspiracy to distribute and possess with intent to distribute controlled substances); and/or 18 U.S.C. §§ 1956, 1957 (money laundering), including controlled substances, money, records relating to controlled substances and/or the proceeds of controlled substances, and/or records relating to the identity of the individual who shipped the package or the intended recipient of the package.